UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

EDDIE LEE SEALS,

        Plaintiff,       18-CV-186Sr

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

---

## DECISION AND ORDER

As set forth In the Standing Order of the Court regarding Social Security Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt. #26.

## BACKGROUND

Plaintiff applied for supplemental security income ("SSI"), with the Social Security Administration ("SSA"), on September 2, 2011, when he was 45 years old, alleging disability due to mental health, anxiety and discomfort in his left shoulder from a gunshot wound when he was a child. Dkt. #8, p.300.

On December 18, 2012, plaintiff appeared without representation and testified at an administrative hearing before Administrative Law Judge ("ALJ"), Curtis

Axelson. Dkt. #8, pp.40-54. Plaintiff testified that he was incarcerated when he was a teenager and has been in and out of prison for seventeen years, spending long periods of time in isolation, and has been homeless and unable to find employment since his release because "people don't get along with me." Dkt. #8, pp.41, 45, 50-52. Plaintiff explained:

> I guess I have a problem with the communication of dealing with people. I can express myself. I catch delirious flashbacks and stuff like that. Like when the police were here talking about searching me I was ready to run. But I learned -- because of my phobia I learned to not fear them now because of my people that I'm around. By me getting out in 2000 from 1983 up to now, I feel as though I adjust a lot to society and I've been letting people know my feelings. That's the only way I can make it. Other than that, it's like I can't deal with a lot of things, you know, like evilness and things like that. People, it's like they, they cruel and like -- it's like I'm a hermit or something.

Dkt. #8, p.41. Plaintiff admitted that he was still hearing voices every day, explaining, " I speak back, like it talks to me like might tell me to do something, I say whether it's right or not, you know." Dkt. #8, p.47. When asked about his ability to work, plaintiff testified:

> I can do what I can do, work or try to work and I'll talk to myself tomake myself keep going, but somebody else might flich in and then will cause a disturbance . . . . And it's like it'll start like where . . . I'm speaking now, it's something that just takes place. And then I'll be like trying to get away and these people will . . . amp me on like easy mislead me, provoke me. I mean, like and I'll be telling them no because I know what's going to show up. I have no control of what shows up until I just break down. I have to break myself down. I have learned that if I eat less -- I have to go all day without eating in order to keep from getting roused up. So, I have to take Paxil or it seem like a drug high, see, and then I start getting dry like I'm doing now, you see.

Dkt. #8, p.48. The ALJ stated that it sounds like he would have problems with co-workers or supervisors, prompting plaintiff to respond:

> what they'll do, they'll lead me on like I'm all right and like I
> know I'm not, and then they'll like pass me on like keep
> kicking me . . . I mean I'll talk like I'm speaking now, but to
> me I'm not making sense. I don't make no type of sense.
> And then just they'll like -- I'll get in trouble, they'll call the
> police or something, you know, always go back to court and,
> I don't know . . .

Dkt. #8, p.49. Plaintiff testified that he was on Paxil, but if he couldn't get Paxil, he used marijuana which made him "more humble like Paxil.". Dkt. #8, p.50.

On January 17, 2013, ALJ Axelson issued an unfavorable decision.[1] Dkt. #8, pp.24-34. Plaintiff appealed to the Appeals Council which denied his request for review on August 6, 2014. Dkt. #8, p.12. Plaintiff filed a complaint with the Western District of New York, which remanded the matter due to the ALJ's failure to satisfactorily explain why the testimony of a vocational expert was not required. Dkt. #8, pp.409-415.

On June 23, 2017, plaintiff, represented by counsel, and his wife, Savannah Seals, appeared and testified, along with an impartial vocational expert, Jay Steinbrenner, before ALJ Eric L. Glazer. Dkt. #8, pp.317-359. Counsel for plaintiff informed the ALJ that plaintiff had just provided him with an assessment from a

---

[1] The ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since the application date of September 2, 2011; (2) plaintiff's residual discomfort of the left shoulder due to a gunshot wound, residual discomfort due to childhood burn to anterior chest, marijuana abuse and anxiety disorder constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the capacity to perform light work with the following limitations: occasional heavy lifting, reaching, pushing and pulling with his left upper extremity and perform two and three step repetitive tasks; and (5) plaintiff's additional limitations did not affect the occupational base of unskilled light work, such that application of the Medical-Vocational Guidelines direct that plaintiff was not disabled within the meaning of the SSA. Dkt. #8, pp.27-33.

psychiatrist, Patty[2] Jones, 870 Ontario Street, that plaintiff had been seeing for approximately 7 years, as well as an assessment from a physical therapist, Greg Stradino. Dkt. #8, pp.320 & 327. Counsel requested an opportunity to supplement the record, which the ALJ granted so that counsel could obtain the clinical records underlying the assessment. Dkt. #8, pp.322, 326 & 328.

Plaintiff testified that he experienced "delirious flashbacks," every day which he conquers by foregoing

> eating meat, started doing remedies and stuff like that, it's sort of how I fit to things that's outside that's unspoken. You know, it's not that I want to get in trouble, its just that I've been getting in trouble so long is that i don't know what's right and what's wrong with stuff of what i was rehabilitated with being locked so I use that to keep in society, then when I married her, she pretty much played a part keeping me out of jail, because a domestic situation. You know when people use me against whatever situation it is, you know, it's cold here in Buffalo, but I don't let it like come to get me down.

Dkt. #8, pp.330-331.

When asked about his treatment with Dr. Jones, plaintiff indicated that he didn't "know who that is though," but "whenever it's a[n] appointment that she have set up, I go see her." Dkt. #8, p.333. Plaintiff reiterated:

> I don't know [who] Dr. Patty Jones is. Whenever she put down or whenever I go see her, she set it up."

Dkt. #8, p.334.

---

[2] The transcript indicates that Dr. Jones' first name is Patty while the assessment itself indicates her first name is Catty.

Plaintiff's counsel interjected his opinion that his client was "not totally coherent" and was unable to "articulate much about his treatment or his condition." Dkt. #8, p.334. The ALJ then agreed to hear testimony from plaintiff's wife, which required plaintiff to leave the room to stay with their infant child in the waiting room. Dkt. #8, pp.335-336. Plaintiff agreed to leave the room, stating, "I don't know if I want to be here, I'm about to walk out, I'm about to say this – all everything," and then indicated:

> I'll run, you know, I'm sorry to speak out, but I'll run, I ran, and she helped me break that for me, because I used to run from my ex-roommate, you know, and I wouldn't get out of the house, but that's something else. I mean, she take care of this and then finish . . .

Dkt. #8, pp.335-336.

Savannah Seals testified that she had been married to plaintiff for four years. Dkt. #8, p.337. Ms. Seals testified that plaintiff saw Dr. Jones, in private practice, three times a week for an hour for the past seven years and also obtains treatment from Lakeshore. Dkt. #8, pp.337-338 & 345-346. Ms. Seals testified that plaintiff was prescribed Paxil, Risperdal and Diazepam, but observed that "it doesn't even have an effect to him, really". Dkt. #8, pp.345 & 348.

When asked about plaintiff's capacity to work, Ms. Seals testified that plaintiff

> doesn't take well with authority figures like whatsoever, like being in the penal system for 30 years and it gives him PTSD where he gets delusional flashbacks so anybody in authority, like even coming here and it being a court setting with you being a Judge and him being an attorney, it puts

> him off in a standby where he gets a delusional flashback
> and he won't actually interact well and he'll catch
> somewhere where he'll either start going erratic emotions
> and you won't know what's going to happen. So, if he has a
> supervisor and the supervisor asks him to do something that
> he doesn't want to do or doesn't feel comfortable doing his
> supervisor tells him he's doing it the wrong way, he might get
> into a confrontation either just verbal or physical and cause
> him to lose his job just based on his mental status.

Dkt. #8, p.340. She testified that she has observed him having flashbacks "usually once a day, or it could be three times a day or it could happen, he might go one day where he won't have it happen, then the rest of the week it will happen every single day, and it's just like anything can trigger him going into a delusional flashback." Dkt. #8, p.341. She described the flashbacks as causing plaintiff to get into confrontations with people "both physical and just verbal over the littlest things." Dkt. #8, p.340. She testified that plaintiff was anti-social and that "you kind of have to be exactly like him to get along with him and nobody is like him, so it's kind of hard." Dkt. #8, p.341. She further explained:

> You can't even have a conversation with this man without
> him taking it the wrong way and getting into the delusional
> flashback and then you have to try to be like whoa, sir, calm
> down, that's not what I meant. And then he's still like no, no,
> no. And like you really have to get into like his mind to
> actually understand what is going on with him. But, like any
> average Joe Blow walking down the street or like somebody
> he works with coworker, they would see him as a problem
> and as a boss he would see him as a problem and you'd be
> like well, I have to let you go because I don't . . . know what
> you're going to do like he's not crazy where he's going to
> physically hurt somebody. Like it's just the fact that like he is
> going to like go out and he's going to rant and you're just
> going to think he's like delusionally crazy. So, he just can't
> interact with people.

Dkt. #8, p.347. She continued:

>
> he only gets violent if you're violent, like the more aggressive
> you get, the more aggressive he gets, so if you don't like
> when you can tell someone's upset, you try to talk them out
> of being upset, if you try to come at him with aggression on
> top of him being aggressive, it's going to escalate, and it
> depends on how far you push it, he'll push it.

Dkt. #8, pp.347-348.

The VE was asked to assume an individual with the residual functional capacity ("RFC"), to perform unskilled[3] light work,[4] with the following additional limitations: occasional overhead reaching on the left side; never crawl; no unprotected heights; no handling, sale or preparation of controlled substances or alcoholic beverages; communicate and understand simple oral instructions and information; performance of simple, routine and repetitive tasks; simple work-related decisions; no

---

[3] Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A perso does not gain work skills by doing unskilled jobs.
20 C.F.R.§ 404.1568(a).

[4] Light work involves lifting no more than 20 pounds at a time and occasionally lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. Is someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

more than incidental interaction with coworkers and the public; no exposure to sudden loud noise, vibration, sirens or bright flashing lights; and absence of 2 hours per month for pre-arranged behavioral treatment appointments. Dkt. #8, p.353. The VE testified that plaintiff would be able to work as a cleaner/housekeeper, cleaning offices after hours, or as a stock checker or small product assembler. Dkt. #8, p.354. When asked if plaintiff could sustain employment if he was incapable of interacting appropriately with his supervisor, *i.e.*, if he yelled at his supervisor, the VE testified such behavior would not be tolerated on an ongoing basis. Dkt. #8, p.357. The VE also stated that more than 2 absences per month would be work preclusive. Dkt. #8, p.358.

By letter dated June 30, 2017, plaintiff's counsel advised that he was still waiting on records from Catty Jones, M.D. and requested that the administrative record remain open. Dkt. #8, p.552. By letter dated August 1, 2017, plaintiff's counsel advised that he had yet to receive requested medical records from Dr. Catty Jones and requested that the SSA isse a subpoena to secure the records. Dkt. #12-3, p.2. A Report of Contract form dated August 21, 2017 states:

> In regard to Catty Jones, M.D., there is nothing in NYS [O]ffice of the Profession, American Medical Association indicating that this doctor is located anywhere. I have checked with these professional sites and found nothing. I went to google and found the site stated on the doctor's report is a gun center and I also called the number on the report and got answering machine that does not indicate that it is a doctor's office.

Dkt. #19, p.3.

The ALJ rendered a decision that plaintiff was not disabled on October 25, 2017. Dkt. #8, pp.294-310. The Appeals Council denied review on January 17, 2013. Dkt. #8, p.360. Plaintiff commenced this action seeking review of the Commissioner's final decision on February 2, 2018. Dkt. #1.

## DISCUSSION AND ANALYSIS

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). The Commissioner must follow a five-step

sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520(a). At step one, the claimant must demonstrate that he is not engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). At step two, the claimant must demonstrate that he has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 404.1520(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 404.1520(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education and work experience. 20 C.F.R. § 404.1520(g).

In the instant case, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since the application date of September 2, 2011; (2) plaintiff's residual discomfort of the left shoulder due to a gunshot wound, residual discomfort due to childhood burn to anterior chest, marijuana abuse and anxiety disorder constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the capacity to perform light work with the following

limitations: occasional heavy lifting, reaching, pushing and pulling with his left upper extremity and perform two and three step repetitive tasks; and (5) plaintiff's additional limitations did not affect the occupational base of unskilled light work, such that application of the Medical-Vocational Guidelines direct that plaintiff was not disabled within the meaning of the SSA. Dkt. #8, pp.27-33.

    Plaintiff argues that the ALJ's failure to inform him of the SSA's post-hearing failure to contact his treating psychiatrist, Dr. Catty Jones, violated plaintiff's due process rights because the ALJ relied upon this information in closing the record. As a result, the ALJ failed to properly develop the record. Dkt. #23, pp.16-21 & Dkt. #25, p.4. Plaintiff also argues that the ALJ improperly relied upon medical opinions rendered in 2011, which were stale by the time of this decision as plaintiff developed degenerative disc disease at multiple levels of his spine and engaged in steady mental health treatment between 2013 and 2016. Dkt. #23, pp.2123. Moreover, the ALJ ignored medical source opinions offered by plaintiff's chiropractor, who opined that plaintiff was 100% temporarily impaired following an automobile accident, and physician's assistant ("PA"), who opined that plaintiff should avoid repetitive movements with his upper limbs due to bilateral carpal tunnel syndrome. Dkt. #23, pp.23-25. Furthermore, plaintiff argues that the ALJ's RFC is not supported by substantial evidence because the ALJ substituted his lay opinion of the medical record for that of medical sources. Dkt. #23, pp.26-30. Plaintiff argues that the ALJ inappropriately faults plaintiff for failing to obtain consistent mental health treatment even though plaintiff suffered serious mental illness and erroneously determined that plaintiff's condition had

stabilized. Dkt. #23, pp.30-33. Finally, plaintiff argues that the ALJ failed to evaluate the testimony of plaintiff's wife. Dkt. #23, pp.33-34.

The Commissioner responds that despite the fact that plaintiff alleges seven years of treatment with Dr. Jones, plaintiff never informed the SSA of any treatment with Dr. Jones until the morning of his hearing, at which point the SSA appropriately assisted plaintiff in obtaining evidence to support his claim by utilizing multiple avenues to contact Dr. Jones and when that proved unsuccessful, the ALJ weighed Dr. Jones' opinion as a treating source despite the absence of underlying treatment records. Dkt. #20-1, pp.13-15 & Dkt. #24, pp.2-5. The Commissioner further responds that the ALJ properly weighed the medical opinion evidence and medical record and appropriately assessed the credibility of plaintiff and his wife and accounted for plaintiff's functional limitations with an RFC supported by the evidence of record. Dkt. #20-1, pp.15-29.

Medical source opinions that are conclusory, stale or based upon an incomplete medical record cannot constitute substantial evidence in support of an ALJ's determination of a plaintiff's RFC. *Camille v. Colvin*, 104 F. Supp.3d 329, 343-344 (W.D.N.Y. 2015), *aff'd*, 652 Fed. App'x 25 (2d Cir. 2016). Moreover, an ALJ's RFC determination must be supported by competent medical opinion; the ALJ is not free to form his own medical opinion based on the raw medical evidence. *Goble v. Colvin*, 15-CV-6302, 2016 WL 3179901, at *6 (W.D.N.Y. June 8, 2016). Finally, in light of the essentially non-adversarial nature of a social security proceeding, it is well accepted

that an ALJ has an affirmative duty to develop the administrative record. *See, e.g., Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). Due to the difficulty in determining whether individuals suffering from mental illness will be able to adapt to the demands or stress of the workplace, the duty to develop the record is particularly important where mental illness is present. *Marcano v. Berryhill*, 17 Civ. 4442, 2018 WL 5619749, at *11 (S.D.N.Y. July 13, 2018). This duty exists even when the claimant is represented by counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

In the instant case, the ALJ gave great weight to a psychiatric evaluation conducted by consulting examiner Susan Santarpia, Ph.D., on October 25, 2011. Dkt. #8, p.225. Dr. Santarpia diagnosed plaintiff with a mood disorder, current cannabis dependence/abuse and a personality disorder, NOS, and opined that plaintiff would have a mild impairment in performing complex tasks independently, making appropriate decision, relating adequately with others, and appropriately dealing with stress. Dkt. #8, p.226. Subsequent medical records, however, suggest significantly more severe psychological symptoms. For example, plaintiff presented to the Erie County Medical Center Comprehensive Psychiatric Emergency Program on November 21, 2011 with auditory hallucinations but refused voluntary admission. Dkt. #8, pp.289-291. On February 5, 2016, DENT Neurological Institute observed that plaintiff "[a]ppears distracted, rambling at times, overall hygiene was poor." Dkt. #8, p.704. Plaintiff's discharge summary from Lake Shore Behavioral Health, where he treated between February 4, 2013 and May 18, 2016, noted the plaintiff "often presented with bizarre and delusional speech and often had to be redirected during session." Dkt. #8, p.764.

When plaintiff returned to Lakeshore Behavioral Health on November 2, 2016, plaintiff was observed "to be mildly delusional" with "some features of PTSD" and "some symptoms of psychosis such as delusions and he hears male voice giving him positive self affirmation." Dkt. #8, p.775. Progress notes from Lower West Side Mental Health dated January 24, 2017, observe that plaintiff's "thought process is circumstantial and somewhat delusional," diagnosing plaintiff with unspecified anxiety related disorder, rule out PTSD, and Schizophrenia Spectrum and other psychotic disorder. Dkt. #8, p.792. In light of these medical records, remand is appropriate to obtain an updated psychiatric medical source opinion as to plaintiff's RFC.

Similarly, the ALJ gave great weight to the opinion of Donna Miller, D.O., following a consulting examination of plaintiff on October 25, 2011, in which she opined that plaintiff had a "mild limitation to repetitive heavy lifting, reaching, pushing, and pulling with his left upper extremity." Dkt. #8, p.231. Subsequent to that examination, as the ALJ recognized, plaintiff was in a motor vehicle accident. Dkt. #8, p.300. Thereafter, an MRI revealed a minimal disc bulge at L3-4, a mild disc bulge at L4-5, disc desiccation and disc space narrowing at L5-S1 (Dkt. #8, p.635), Buffalo Neurosurgery Group advised that he was not a good surgical candidate given the multi-level nature of his discs" (Dkt. #8, p.647), and records from Pain Rehab of WNY appear to indicate limited range of motion. Dkt. #8, pp. 649-654. Moreover, an MRI of plaintiff's brain on February 20, 2016 was abnormal, revealing "scattered juxacortical white matter changes in both cerebral hemispheres." Dkt. #8, p. 709. As there is no medical source opinion as to the potential effect of these objective findings upon plaintiff's RFC, remand is necessary.

As remand will afford plaintiff the opportunity to respond to the Commissioner's inability to locate Catty Jones, M.D., the Court need not address plaintiff's due process argument.

## CONCLUSION

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #15), is granted in so far as it seeks remand and the Commissioner's motion for judgment on the pleadings (Dkt. #17), is denied.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**DATED:** **Buffalo, New York**
**September 30, 2019**

                                   *s/ H. Kenneth Schroeder, Jr.*
                                   **H. KENNETH SCHROEDER, JR.**
                                   **United States Magistrate Judge**